IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LACEY STRADFORD, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 16-2064 |
| | : | |
| JOHN WETZEL, | : | |
| *SECRETARY PENNSYLVANIA* | : | |
| *DEPARTMENT OF CORRECTIONS* | : | |

### MEMORANDUM

**Juan R. Sánchez, C.J.**                                                      **February 12, 2021**

Plaintiffs, Pennsylvania parolees with sex offense classifications, bring this putative class action and assert an equal protection claim against Defendant John Wetzel, the Secretary of the Pennsylvania Department of Corrections (the DOC). Plaintiffs claim that although they have been granted parole, their release from prison and placement into DOC-operated halfway houses has been significantly delayed because of the DOC's policy of considering community sensitivity to a criminal offense in making these placements. Because the consideration of community sensitivity disproportionately delays the placement of parolees with a sex offense classification, Plaintiffs have been subject to prolonged incarceration following a grant of parole which individuals without a sex offense classification do not have to endure. The parties now cross-move for summary judgment; the DOC arguing it has established a rational basis for delaying sex offender placement and Plaintiffs arguing the contrary. Because "mere negative attitudes, or fear," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985), do not justify treating sex offenders differently from other parolees in halfway house placement, and there is no other legitimate reason served by the DOC's treatment of sex offenders, the Court will grant Plaintiffs' motion and deny the DOC's motion.

**BACKGROUND**

Plaintiffs Lacey Stradford, William Nettles, Jesse Stroud, William Scott, and Richard Richardson are all offenders with sex offense classifications who are, or were formerly, incarcerated in State Correctional Institutions in Pennsylvania.[1] While incarcerated, Plaintiffs have been granted parole but have either not yet been released or have experienced delay in being released on parole. Plaintiffs, like all incarcerated individuals in Pennsylvania, are statutorily eligible for parole after serving their minimum sentence as fixed by their sentencing judge. The Pennsylvania Board of Probation and Parole (the PBPP) investigates all individuals eligible for parole. In deciding whether to grant parole, the PBPP considers several factors, including the nature and circumstances of the offense, the recommendations of the judge and prosecuting attorney, the character and background of the individual, the individual's conduct in prison and participation in treatment, the individual's physical and mental condition, and the individual's complete criminal record. The PBPP also considers the positive recommendation of the DOC, an individual's demonstrated motivation for success, and whether the individual has accepted responsibility for the offense committed.

Individuals with sex offense classifications are subject to additional requirements as part of the parole process. Prior to being considered for parole, sex offenders must complete a sex offender treatment program. *See* Def.'s Statement of Material Facts ¶ 13.[2] At the time of parole

---

[1] In its Answer, the DOC denies that Plaintiff Nettles has a sex offense classification and contests Plaintiffs' allegations regarding Plaintiff Scott but does not contest the allegations regarding the remaining Plaintiffs. *See* Ans. ¶ 2. Neither party addresses this factual dispute in their respective motions.

[2] Although the DOC initially denied this allegation in Plaintiffs' Amended Complaint, the DOC now asserts sex offenders must complete a sex offender treatment program before being considered for parole, citing Plaintiffs' Amended Complaint.

consideration, the Pennsylvania Sex Offenders Assessment Board, consisting of psychiatrists, psychologists, criminal justice experts, and behavior and treatment professionals, evaluates each sex offender.

After considering and evaluating each individual, the PBPP must decide whether to grant a "positive parole action," which essentially grants the individual parole subject to certain requirements. Parole is granted when the PBPP determines that the best interests of the individual justify or require that parole be granted and the interests of the Commonwealth will not be injured by the individual's parole. The PBPP evaluates individuals convicted of a violent offense "at a more stringent standard than non-violent offenses." Making Parole Decisions, Pa. Parole Board, https://www.parole.pa.gov/Parole%20Process/Making%20Parole%20Decisions/Pages/default.as px (last visited Feb. 10, 2021). A positive parole action is granted if the PBPP finds "there is no reasonable indication that the individual poses a risk to public safety." Am. Compl. ¶ 7; Ans. ¶ 7.

When the PBPP grants parole, it is typically with the condition that the individual have an "approved home plan." *See* Pinard Decl. ¶ 7, ECF No. 75-3. This approved home plan can be a personal approved residence or placement in a DOC-operated halfway house. Due to the difficulty in finding an approved residence and obtaining sufficient money to cover rent and other costs of living, most individuals must rely on placement in a halfway house to be released on parole pursuant to an approved home plan. Thus, halfway house placement is often a condition of the grant of parole.

The DOC operates halfway houses known as Community Corrections Centers or Community Contract Facilities (collectively, CCCs).[3] CCCs are governed and operated by the

---

[3] CCCs are DOC-operated facilities whereas CCFs are privately-owned facilities that provide halfway house services pursuant to contracts with the DOC. *See* Pinard Decl. ¶ 6, ECF No. 75-3.

DOC's Bureau of Community Corrections (the BCC). The BCC places individuals in and discharges them from any and all CCCs. The BCC's goal is to assist parolees and reentrants with their transition into society. The BCC decides whether a parolee is placed in a CCC, which CCC the parolee is placed, and when that placement occurs.

The DOC and BCC's policy regarding CCC placement has evolved over the life of this case. In 2016, when this case was initiated, the policy treated parolees with a sex offense classification differently from other parolees without that classification. Under that policy, sex offenders who received positive parole actions were precluded from CCC placement until 24 months before their maximum sentence date, unlike other parolees without sex offense classifications who were placed upon receiving a positive parole action. Sex offenders were regularly designated as "hard to place," rejected for CCC placement at the time of their initial application once being granted parole, and required to reapply for placement after waiting until 24 months before their maximum sentence date. Despite being granted parole, the policy effectively kept parolees with sex offense classifications incarcerated for longer periods of time because they were unable to secure approved housing outside of CCC placement. This policy was the subject of the DOC's first motion to dismiss and the Court's March 31, 2017, Memorandum and Order granting the motion and dismissing Plaintiffs' claims.

Plaintiffs subsequently appealed the dismissal to the Third Circuit Court of Appeals and the DOC altered the policy regarding CCC placement for the first time. While the appeal was pending in 2017, the DOC removed the 24-month limitation as applied to parolees with sex offense classifications. Rather than requiring sex offenders to wait until 24 months before their maximum

---

There are 10 CCCs and 19 CCFs. The placement process for both types of facilities appears to be the same, and the Court makes no distinction between the two throughout this Memorandum.

4

sentence date for CCC placement, the DOC developed a plan to place sex offenders in the "Progress CCC," a 25-bed CCC used to reintegrate sex offenders into the community. The DOC states it developed this plan to "alleviate the backlog of paroled sex offenders in the institutions" and provide them with 60–90 days of meals and programming. *See* Pinard Decl. ¶ 33, ECF No. 75-3. The parties dispute whether release to Progress CCC constitutes continued incarceration or release on parole. After spending the requisite time in Progress CCC, sex offenders were released or transferred to another CCC. *See id.*

The policy again changed in 2018 when the DOC began reducing its use of Progress CCC to house sex offenders. And in August 2019, the DOC decided to discontinue its use of Progress CCC to house sex offenders altogether. The last sex offender housed at Progress CCC was released on October 10, 2019. At this time, the DOC contends that it has no intention of using Progress CCC to house sex offenders prior to release to other CCCs.

Regardless of the changing policy regarding CCC placement of sex offenders, the BCC makes several considerations to determine whether one receives a placement, where that placement will be, and when the placement will begin. Upon receiving a referral for CCC placement, the BCC follows the DOC's policy 8.1.1, Section 4 in making decisions about whether and where to place a parolee. This policy states:

> The goal is to place individuals in their home region, district, or county when possible; however, these factors may affect placement:
>
> a. *community sensitivity to a criminal offense or specific criminal incident*;
> b. board action stipulations;
> c. program needs vs. program availability in a particular area;
> d. separations from other reentrants or staff;
> e. multiple failures at one facility;
> f. victim consideration;
> g. medical and/or MH needs;
> h. final discharge maximum expiration (FDME) date;
> i. gender status of the facility;

j. pilots or studies being conducted;
k. request by the reentrant for relocation (must provide reason);
l. available community resources/support; and
m. where the reentrant's committing county, requested release county, and home county are in relation to an appropriate center.

Def.'s Ex. B, ECF No. 75-3 (emphasis added). The policy has been in effect since November 21, 2017.

Under the most current version of the policy, there is no longer the 24-month limitation for CCC placement and the BCC no longer uses the "hard to place" designation. *See* Pinard Decl. ¶ 16, ECF No. 75-3. If a sex offender is denied CCC placement, the BCC's denial letter now informs the offender to reapply after a specified date or if circumstances change.[4]

Even under this new policy, parolees with sex offense classifications still experience delays in being placed in CCCs as compared to parolees who are not sex offenders. Sex offenders who are designated as "sexually violent predators" (SVPs) experience the longest delays in placement after receiving a positive parole action. Although the DOC does not dispute SVPs experience delay in placement, the DOC does dispute sex offenders who are not designated as SVPs experience delay as compared to other parolees seeking CCC placement. Specifically, the DOC states: "[A]ll non-SVP sex offender referrals have been reviewed and processed in the same manner as all other non-sex offender referrals." Pinard Decl. ¶ 8, ECF No. 79-2.

Although the DOC maintains that there is no delay in placing sex offenders who do not have an SVP-designation, data provided by the DOC suggest otherwise.[5] During discovery, the

---

[4] There is no evidence in the record as to how this date is determined or why rejected offenders must wait until a specified date to reapply.

[5] The parties dispute the data in this paragraph. The DOC contends it has moved to place as many sex offenders as possible throughout 2020, leaving only one sex offender who is not also designated as an SVP without a placement. By relying on post-discovery data, however, the DOC's efforts have created a moving target for determining the length of delay, if any, that exists for those

DOC provided Plaintiffs with data regarding inmates who received a positive parole action prior to February 13, 2020, and who remained incarcerated as of April 28, 2020. This included 176 inmates with a sex offense classification (SVP and non-SVP) and 828 without the classification. According to this data, 48.3% (85 of the 176) inmates with a sex offense classification and 12.1% (100 of the 828) inmates without a sex offense classification had a positive parole action prior to December 1, 2019. For those with a sex offense classification who received a positive parole action on or before December 1, 2019, the average number of days between the inmates' positive parole action and December 1, 2019, was 612.9 days. Of the 85 with a sex offense classification and a positive parole action prior to December 1, 2019, 89.4% of them (76) remained incarcerated as late as June 4, 2020. For the 100 inmates without a sex offense classification who received a positive parole action prior to December 1, 2019, in contrast, the average number of days between the inmates' positive parole action and December 1, 2019, was only 92.8 days. Of this group without a sex offense classification, 48% (48) remained incarcerated as late as June 4, 2020. In sum, the data show inmates with a sex offense classification remained incarcerated far longer than other inmates after receiving a positive parole action and seeking CCC placement.

Because of the data showing the delay sex offenders face in being released on parole and placed in a CCC, Plaintiffs maintain the delay is caused by the DOC's policy of considering community sensitivity to a criminal offense for CCC placement. Although the consideration of community sensitivity in the policy applies to all offenders, the DOC admits the consideration

---

with a sex offense classification. The Court uses the data above because it covers the length of discovery as stated in the Court's scheduling order and agreed upon by the parties and it provides established dates to compare offenders. Discovery was to be completed before May 5, 2020, and the parties agreed to exchange data regarding inmates who received a positive parole action before December 1, 2019, and before February 13, 2020. Based on this data, it is clear that sex offenders continue to experience some delay compared to those without the classification (regardless of the DOC's efforts to make placements in 2020).

most often affects the placement of sex offenders. *See, e.g.*, Hr'g Tr. 13:20–23, 24:22–25:2 ("[I]n practice the community sensitivity factor most likely comes up . . . when it comes to sex offenders, specifically SVPs."), Nov. 16, 2020. This consideration is at the crux of the dispute in this case and the parties have differing views as to whether the DOC's policy of considering community sensitivity to a criminal offense, as stated in Policy 8.1.1, Section 4, justifies the delay those with sex offense classifications experience in being placed in CCCs. The DOC argues the community sensitivity factor is particularly important to consider in the placement of sex offenders, and particularly SVPs, because sex offenders must comply with registration and notification requirements under Pennsylvania's Megan's Law. The DOC also states, "[a]bsent this notification requirement imposed by the legislature, [the] BCC would be able to place [them] in the same manner as any other offender." Pinard Decl. ¶ 23, ECF No. 75-3.

Pursuant to Megan's Law, individuals who commit a designated sex offense are required to register as a sex offender with the Pennsylvania State Police. In addition to registration, sex offenders who have been designated as an SVP are subject to community notification requirements. Under those requirements, the chief law enforcement officer of the police department of the municipality where the SVP will reside must notify neighbors, school officials, child services officials, and childcare facilities of the SVP's presence. This is usually done through community notification flyers which provide specific information about the SVP. Due to the notification requirements, the BCC has received a number of complaints regarding the housing of SVPs in certain CCCs. *See id.* ¶ 24. The BCC considers these complaints when deciding where to place individuals and ultimately whether an individual is placed in a particular CCC. *See id.* ¶ 25.

In 2016, Plaintiffs filed their initial Complaint in this matter alleging the DOC was violating the Equal Protection Clause because of its then-policy prohibiting convicted sex

offenders who had received a positive parole action from entering CCCs until 24 months before their maximum sentence date. The DOC moved to dismiss the Complaint arguing it had a rational basis for its policy. On March 31, 2017, the Court granted the motion and dismissed Plaintiffs' Complaint. Subsequently, Plaintiffs appealed.

As briefly discussed, while the case was pending before the Third Circuit Court of Appeals, the DOC changed its policy, removed the 24-month limitation, and began its practice of housing sex offenders at Progress CCC. The DOC argued this policy change mooted the case, prompting the Third Circuit to remand the case and direct this Court to determine the mootness issue. On January 17, 2019, the Court held the policy change did not moot the case because there was evidence that only sex offenders experienced delay before receiving a placement in a CCC (whether by first being placed in Progress CCC or otherwise).

On November 5, 2019, the Third Circuit agreed the case was not moot; however, it determined Plaintiffs' equal protection challenge to the DOC's use of Progress CCC had not been considered by the Court. The Third Circuit thus remanded the case for the Court to grant Plaintiffs leave to file an amended complaint addressing these new allegations.

On remand, Plaintiffs filed the Amended Complaint challenging not only the DOC's use of Progress CCC, but also the DOC's policy of considering community sensitivity when making decisions about placing sex offenders into CCCs. *See* Am. Compl. ¶¶ 42–44. The parties proceeded through discovery and on July 22, 2020, each filed a motion for summary judgment. The DOC argues it is entitled to judgment because it has established a rational basis for its policy and, in the alternative, because its decision to discontinue use of Progress CCC has mooted Plaintiffs' claims. Plaintiffs argue they are entitled to judgment because community sensitivity is not a rational

justification for the continued delay in releasing sex offenders into CCCs. The Court held a telephonic oral argument on the motions on November 16, 2020.

**DISCUSSION**

Pursuant to Federal Rule of Civil Procedure 56, a court shall grant summary judgment if "there is no genuine issue as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, a court must "view all facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). If, viewing the facts in this light, a reasonable jury could find for the nonmovant, then summary judgment must be denied. *See Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is material if it might affect the outcome of the suit under governing law." *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 317 (3d Cir. 2014). A court must thus look to the elements of the underlying claim to determine whether factual disputes are material. *See Forrest*, 930 F.3d at 105.

Where, as here, cross-motions for summary judgment are filed, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (alteration omitted) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998)).

Although the parties offer competing views on whether the DOC's policy comports with the Equal Protection Clause, the Court concludes it does not. The Court holds the DOC's policy of considering community sensitivity and delaying the release of parolees with a sex offense

10

classification on that basis violates the Equal Protection Clause of the Fourteenth Amendment. The Court will therefore grant Plaintiffs' motion, deny the DOC's motion, and enjoin the DOC from continuing this unconstitutional practice.[6]

"The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In addressing an equal protection claim, a court must first determine whether comparable parties are similarly situated. *See Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 348 (3d Cir. 2017). "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

---

[6] On the threshold issue of mootness, the Court finds the case is not moot despite the DOC's discontinued use of Progress CCC and will deny the DOC's motion on that basis as well. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Ordinarily, a defendant cannot moot a case while litigation is ongoing simply by ending its unlawful conduct. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [it] left off, repeating this cycle until [it] achieves all [its] unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Because of this concern, the defendant must meet "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190.

The DOC argues this case is now moot because it no longer uses Progress CCC to house sex offenders prior to their release to other CCC facilities; however, this argument fails to consider the entirety of the Amended Complaint and Plaintiffs' challenge. While the DOC maintains it has discontinued the use of Progress CCC, it has not ceased the conduct that forms the crux of Plaintiffs' Amended Complaint, i.e., delaying CCC placement for individuals with sex offense classifications. The DOC's consideration of community sensitivity remains and appears to be the principal reason for this delay. Even though parolees with sex offense classifications are no longer housed at Progress CCC, they still challenge the fact that they are not placed in other CCCs at the same pace as other parolees due to the consideration of community sensitivity. The DOC continues to change its policies and procedures regarding parolees, particularly those with sex offense classifications, but their delay into CCC placement has remained unchanged. As a result, this case is not moot. The Court will thus deny the DOC's motion for summary judgment on this ground as well.

The court must then determine the level of scrutiny to be applied to ensure that a state's classification complies with the Equal Protection Clause. Suspect or quasi-suspect classifications, or those impacting certain fundamental constitutional rights, are subject to heightened scrutiny. *Artway v. Attorney Gen. of State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996). Other classifications, however, are only subject to rational basis review. *See id.* (citing *Chapman v. United States*, 500 U.S. 453, 465 (1991)). In this case, the parties agree that a sex offense classification is not suspect or quasi-suspect and that fundamental constitutional rights are not at issue. Therefore, the policy is subject only to rational basis review. *See id.* (holding repetitive or compulsive sex offenders are not suspect or quasi-suspect class); *cf. Chapman*, 500 U.S. at 465 (applying rational basis test to classification based on nature of offense).

When applying rational basis review to a challenge under the Equal Protection Clause, state action is "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S at 440. "[T]he plaintiff must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational." *Real Alternatives, Inc.*, 867 F.3d at 348 (internal quotation marks and citation omitted).

As an initial matter, Plaintiffs, inmates with a sex offense classification who were approved for parole but remain incarcerated due to delays in CCC placement, are similarly situated to other inmates who have been approved for parole but have received CCC placements without delay. Inmates in both groups have received a positive parole action from the PBPP, reflecting the PBPP's determination that there is no reasonable indication that the individual poses a risk to public safety. And both groups require placement in a CCC in order to obtain release on parole as a requirement of their approved home plan or as the only option to have their home plan approved. The only

difference between the two groups is that Plaintiffs have a sex offense classification, but this is not a relevant distinction because regardless of the offense a parolee has committed, they have all been granted parole by receiving a determination that they do not pose a risk to public safety.

The DOC argues inmates with a sex offense classification who have been approved for parole are not similarly situated to other inmates who have been approved for parole because of the Megan's Law registration and community notification requirements to which those with a sex offense classification are subject. The Court is unpersuaded. Those who have committed sex offenses are required to register with the Pennsylvania State Police and, if further designated as an SVP, are also subject to community notification requirements. These requirements, however, are part of the very classification on the basis of which Plaintiffs argue they are suffering discrimination. Although other parolees are not subject to such requirements, the requirements are part of the classification of being a sex offender. The DOC's argument thus asks the Court to ignore the very classification that Plaintiffs assert they are discriminated on the basis of because the classification makes them different from other inmates who have received a positive parole board action.[7] Declining to do so, the Court holds Plaintiffs, inmates with a sex offense classification who have received a positive parole action and are awaiting placement in a CCC, are similarly situated to inmates who have received a positive parole action, are awaiting placement in a CCC, but do not have a sex offense classification.

---

[7] Also, the DOC notes that the Megan's Law requirements often play into its consideration of community sensitivity and the placement of sex offenders into CCCs. See Pinard Decl. ¶ 23 (stating "[a]bsent th[e] notification requirement imposed by the legislature, BCC would be able to place SVPs in the same manner as any other offender"), ECF No. 75-3; Def.'s Statement of Material Facts ¶¶ 17, 19–21, 35 (acknowledging the only difference relevant to the BCC's placement policy is the sex offender designation itself, not the parole consideration or the conduct of the offender following placement).

Turning to the rational basis test, the Court concludes the DOC's policy in this case does not pass muster. The parties agree that classifications based on type of criminal offense, such as sex offenders, are reviewed under the rational basis test requiring "a rational means to serve a legitimate end." *See New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 310 (3d Cir. 2007). The DOC "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446 (internal citations omitted). Nevertheless, to satisfy their burden to establish the policy at issue here is unconstitutional, Plaintiffs must "negate every conceivable justification for the classification in order to prove that the classification is wholly irrational." *Real Alternatives, Inc.*, 867 F.3d at 348 (citation omitted).

In this case, Plaintiffs' challenge is focused on the delay sex offenders face in being released from incarceration into a CCC after they have been granted parole. The DOC contends this delay occurs due to its policy of considering numerous factors including community sensitivity to a specific criminal offense.[8] The question presented here is thus whether community sensitivity justifies the delay in sex offenders' release on parole into CCCs. The parties also dispute whether the DOC's policy of considering community sensitivity is justified by other proffered governmental interests. For instance, the DOC contends its policy of considering community sensitivity is justified by its interest in ensuring parolees are able to successfully integrate into society upon release. Ultimately, however, the question is whether the differential treatment here, delaying sex offenders' release into CCCs after receiving a positive parole action, serves a

---

[8] The policy is facially neutral; however, the parties agree the consideration of community sensitivity only applies to and affects the CCC placement of sex offenders. *See, e.g.*, Hr'g Tr. 11:12–16; 13:20–23; 24:22–25:2 ("[I]n practice the community sensitivity factor most likely comes up . . . when it comes to sex offenders, specifically SVPs."), Nov. 16, 2020.

legitimate governmental interest. Because the Court cannot find a legitimate governmental interest served by the delay in Plaintiffs' release, the Court will grant Plaintiffs' motion and deny the DOC's motion.

Initially, the DOC's concern with community sensitivity is not a legitimate basis for delaying sex offenders' release following a positive parole action. The Supreme Court has recognized that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable . . . , are not permissible bases for treating" one group differently from another. *City of Cleburne*, 473 U.S. at 448. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Id.* (internal citations and quotation marks omitted). Here, because sex offenders with a positive parole action, like other offenders who have been approved for parole, have been found not to pose any reasonable risk to public safety, any community sensitivity to a parolee's sex offense is based solely on the community's perception of the sex offense classification and not any substantiated facts or circumstances.[9] Hence, the DOC's consideration of community sensitivity merely gives effect to private biases that may exist in a given community regarding sex offenses.

With regard to sex offenders who are not designated as SVPs, the record contains no evidence suggesting that the community receives any formal notification of their presence in the community. Because the community is not notified when non-SVP sex offenders are released into the community, the concern with community sensitivity must be merely assumed based on their classification. The assumption of community sensitivity is particularly irrelevant because sex

---

[9] Also, while it may appear that the consideration of community sensitivity would also have an effect on other kinds of offenders, the DOC stated during oral argument that community sensitivity only affects the manner in which sex offenders are placed. *See* Hr'g Tr. 24:18–25:2, Nov. 16, 2020. Thus, although the policy appears neutral on its face, its application and effects are admittedly only relevant to sex offenders.

offenders who have been granted parole have already been determined to present no reasonable indication that they pose a risk to public safety. Although the DOC contends it has received complaints regarding sex offenders' placement in CCCs in the past, those complaints do not justify delaying the release of other sex offenders merely because of their classification as a sex offender.[10] *See City of Cleburne*, 473 U.S. at 448 (stating negative attitudes regarding a specific class are not a legitimate reason to treat the class differently). The "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Yet this appears to be exactly what motivates the delayed placement of sex offenders because the community sensitivity factor appears to be little more than a conduit for private biases against sex offenders.

While the community does receive notification when individuals designated as SVPs are released, community sensitivity is still not a legitimate justification for delaying their release into CCCs. Notification is intended to provide the community with the opportunity to "develop constructive plans to prepare itself for the release of [SVPs] and offenders." 42 Pa. Cons. Stat. § 9799.51. Although community notification is justified by the legitimate government interest in community preparation, the DOC does not argue community preparation justifies the policy at issue in this case—the continued imprisonment of sex offenders who have completed their treatment programs, been approved for parole, and are awaiting placement into a CCC. And, in fact, community preparation would not be a legitimate justification for the policy in this case because there is no evidence that the continued imprisonment of sex offenders allows communities

---

[10] The Court also notes there is no evidence regarding the context of these complaints and the specific concerns stated within.

to prepare or that communities are *more* prepared when sex offenders are released later than other similarly situated parolees.

The legislature has determined that communities are entitled to notification when SVPs live near them; however, the DOC has not identified any governmental interest or policy that allows communities to effectively prevent SVPs from living near them (whether in a CCC or a personal residence) by filing complaints with the DOC. In fact, the Pennsylvania State Police Megan's Law Website states that the information in the sex offender registry and provided through community notification is intended to enhance public safety through knowledge and preparation, and explicitly prohibits the use of the information for any other purpose, including to threaten, intimidate, or harass a registrant. *See* PA Megan's Law Terms and Conditions, Pa. State Police, https://www.pameganslaw.state.pa.us/Home/TermsAndConditions (last visited Feb. 10, 2021). And importantly, the Supreme Court has specifically rejected the notion that the government may avoid the strictures of the Equal Protection Clause "by deferring to the wishes or objections of some fraction of the body politic." *City of Cleburne*, 473 U.S. at 448. Therefore, based on the record, the Court cannot conclude that the community notification requirements for SVPs, or the consideration of community sensitivity at all, justify the policy of delaying sex offenders' release to CCCs. And community preparation, although a legitimate governmental interest, is not rationally related to this policy.

Turning to the DOC's other asserted governmental interests, the Court cannot conclude that they are served by the policy of delaying sex offenders' release on parole into CCCs. The DOC states it has a separate legitimate interest in placing sex offenders in facilities that will assist them in reintegrating into society and also argues this interest permits it to consider community

sensitivity to an offense. The DOC contends sex offenders are unable to successfully reintegrate

into society when the community opposes their presence or has negative views of their offenses.[11]

Although successful reintegration is a legitimate governmental interest, there is no

evidence in the record to suggest that delaying sex offenders' release to CCCs is rationally related

to this interest. There is no evidence in the record showing that communities are more accepting

of sex offenders or that sex offenders are more successfully reintegrated into the community when

their release is delayed. *See Hoffman v. Vill. of Pleasant Prairie*, 249 F. Supp. 3d 951, 962 (E.D.

Wis. 2017) (finding no rational basis for treating certain sex offenders differently than others where

the government failed to offer any evidence of a justification for the differential treatment). Nor is

there any evidence that the DOC does anything to measure or improve community sensitivity or

acceptance during the time in which a sex offender's release is delayed. Without such evidence,

the only conclusion is that community acceptance and the likelihood of successful reintegration

remains unchanged regardless of whether sex offenders are released to a CCC immediately after

they are granted parole or after a one-, two-, or even three-year delay.[12] Because there is no

---

[11] The DOC's reliance on community integration as a justification appears to be an attempt to disguise the impermissible consideration of personal biases regarding sex offenders in CCC placement. The Court notes the DOC's policy lists community sensitivity *and* available community resources and support as separate considerations for CCC placement. *See* Def.'s Ex. B, ECF No. 75-3. Here, Plaintiffs only challenge the consideration of community sensitivity, not the independent consideration of available community resources and support. Additionally, the DOC has stated the delay in placing sex offenders is due to community sensitivity and complaints, not available resources and support. Because the DOC has not provided any evidence that limitations on community resources and support impede placement of sex offenders in CCCs, the Court can only conclude that this factor does not affect sex offenders' placement in the same manner as community sensitivity. Nevertheless, Plaintiffs do not challenge the consideration of available resources and support (and likely cannot) because delaying release to a CCC due to unavailable treatment programs or resources has already been determined to be a constitutional practice. *See Dantzler v. Tennis*, No. 08-1612, 2008 WL 4274486, at *2 (E.D. Pa. Sept. 17, 2008).

[12] This point applies equally to all of the DOC's proffered justifications. While the DOC maintains its legitimate interests include community sensitivity, preventing disproportionality, and even

evidence that the lapse of time serves the DOC's interest in successful reintegration, the Court finds this interest does not satisfy the rational basis test. *See New Directions Treatment Servs.*, 490 F.3d at 312 (noting the district court may conclude that no conceivable facts provide a rational basis because the city failed to offer any evidence to support its stated concerns).

The DOC also contends it has a legitimate interest in ensuring that no one CCC and surrounding community be required to house a disproportionate number of sex offenders. The DOC suggests (without evidence) that if it were to release sex offenders without delay at the same pace as other offenders, the CCCs would be overburdened with sex offenders, which would, in turn, overburden the communities in which the CCCs are located. Although the legitimacy of the interest in proportionality is unclear, the DOC states its interest is "squarely in line with the legislative intent" to protect the public as expressed in Pennsylvania's Megan's Law. *See* Def.'s Mot. for Summ. J. 9, ECF No. 75-2. However, the DOC has produced no evidence suggesting that the delay in releasing sex offenders prevents the disproportionality or "overburdening" of any given CCC or community or that any disproportionality actually creates a public safety problem. This disproportionality interest appears to be the same proffered community sensitivity interest in different packaging. If the community's sensitivity to this category of individuals cannot justify the differential treatment of one sex offender, then it follows that it cannot justify the differential treatment of multiple sex offenders.

Sex offenders who have received a positive parole action have already been determined to present no reasonable indication that they are a harm to public safety. This determination suggests

---

public safety, there is no evidence that these interests are served by delaying sex offenders' release on parole. In fact, because this case is limited to sex offenders who have received a positive parole action, the question is not whether they get released, but when. Any purported interests exist equally at the time of the positive parole action and the time of delayed release.

that, despite the sex offense classification, any individual approved for parole is not a threat to public safety. Considering that many parolees, regardless of their offense type, are housed in CCCs, the DOC does not have concerns about concentrations of parolees in CCCs in general. And there is no evidence the concentration of multiple parolees housed in one facility or community threatens each individual's finding of safety made upon the grant of parole. Likewise, as for sex offenders, there is no evidence that, when more than one sex offender is placed in a CCC or community, they are more likely to engage in recidivist behavior or would threaten the community's safety as compared to other groups of offenders.[13] *Cf. City of Cleburne*, 473 U.S. at 450 (rejecting city's concern with overcrowding and occupancy because the city failed to justify "its apparent view that other people can live under such 'crowded' conditions when mentally retarded persons cannot").

The Court recognizes the DOC and the Pennsylvania legislature can reasonably conclude that sex offenders in general pose a heightened risk to the public safety and accordingly, implement policies to combat that concern. *See Smith v. Doe*, 538 U.S. 84, 103 (2003) (stating state legislatures can *"*conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism"). But that interest is not implicated here because this case is limited to sex offenders

---

[13] The Court also notes that parolees assigned to CCCs are subject to strict rules and policies to ensure their successful reintegration into the community and adequately protect the communities surrounding the CCCs. *See* Rules and Policies, Pa. Dep't of Corrs.: Community Reentry, https://www.cor.pa.gov/community-reentry/BCC_Operations/Pages/Rules-and-Policies.aspx (last visited Feb. 10, 2021). These rules and policies again show sex offenders, like all other parolees, are closely monitored while living in the CCCs and are subject to disciplinary action, including reincarceration, in the event they fail to comply with any rule or engage in recidivist behavior. Because the DOC has failed to produce evidence that these rules and policies are insufficient as applied to sex offenders, the record is unclear as to how the characteristics of sex offenders justify delaying their release to CCCs while other types of offenders are not subject to similar delays. *Cf. City of Cleburne*, 473 U.S. at 450 (acknowledging that occupants of "home for the mentally retarded" would meet all federal and state regulations for group housing with support staff and could not be treated differently due to concerns with density of individuals).

who have been approved for parole based on the PBPP's finding that they do not pose a threat to public safety. The issue here is not whether to grant parole but whether, once parole has been granted, the DOC can delay the release of sex offenders to CCCs. The interest in public safety and the risk of recidivism is also unsupported by the record which contains emails from within the DOC noting sex offenders who receive treatment, as required before the grant of parole, have the lowest risk of recidivism among offense categories. *See* Pls.' Ex. E, ECF No. 78-2. And to the extent the DOC and legislature find sex offenders do pose a unique risk to public safety, the registration and community notification requirements listed in Megan's Law already address those concerns. *Cf. Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972) (stating proffered public health justifications were unreasonable because such issues were already addressed by other federal and state public health regulations in place).

On a final note, the Court acknowledges it previously granted the DOC's motion to dismiss this action by finding a rational basis for the DOC's earlier 2016 policy. At oral argument, the DOC argued the Court should find a rational basis for its current policy because the Court previously held public safety and the concern with releasing sex offenders in large numbers sufficiently justified the DOC's policy of delaying sex offenders' placement until 24 months before their maximum sentence date. But that ruling does not require the Court to reach the same conclusion now.

First, the issue and circumstances are significantly different after years of litigation, the DOC having twice changed its policy, completed discovery, and the parties tailoring their arguments. The issue now before the Court is certainly more factually developed than it was when the Court ruled on the DOC's motion to dismiss based solely on the allegations in the Complaint in 2017. Here, the Court has the benefit of a record which establishes the delay sex offenders face

and fails to support any potential governmental interests. Second, upon further review, the Court is persuaded that Plaintiffs have the better argument and that its earlier decision was in error. In reaching this conclusion, the Court is mindful that "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat. Bank & Tr. Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

In sum, the DOC has not proffered a legitimate justification for its policy of delaying the release of sex offenders to CCCs after they receive a positive parole action. Any consideration of community sensitivity—which on this record is merely private biases against sex offenders—is not a permissible basis for treating sex offenders differently. As for concerns with public safety, these considerations are misleading because sex offenders seeking placement in a CCC (like all other offenders who have received a positive parole action) have received a determination that there is no reasonable indication that they pose a risk to public safety and they are subject to the strictures of Megan's Law which also provide protection to the public. And finally, the DOC's concerns with community integration and proportionality within the CCCs and surrounding communities are unaffected by whether sex offenders are released in a timely manner or after lengthy delays, suggesting this interest is neither legitimate nor rationally related to the current policy. Because there are no legitimate bases for delaying sex offenders' release to CCCs, and any potential justifications are not rationally related to the policy, the Court will deny the DOC's motion for summary judgment.

For the same reasons, the Court will grant Plaintiffs' motion. Because the Court concludes the DOC's policy is not rationally related to a legitimate government interest, the policy violates the Equal Protection Clause and is unconstitutional. The Court will therefore enter an order

enjoining the DOC from considering community sensitivity to an offense when determining placement of offenders in CCCs.

**CONCLUSION**

Plaintiffs, and their putative class of incarcerated individuals with a sex offense classification who have been approved for parole and are in need of placement in a CCC, experience delays in being released to CCCs on parole. The DOC delays the placement of those with sex offense classifications due in large part to its consideration of community sensitivity to sex offenders. Under rational basis review, however, this justification fails. Each of the other potential governmental interests also fails because they are either illegitimate or not served by the delay in the release of those with sex offense classifications. As a result, the DOC's policy of delaying CCC placement for those with a sex offense classification and consideration of community sensitivity as stated in the DOC's Policy 8.1.1, Section 4(a), violates the Equal Protection Clause. The Court will thus deny the DOC's motion for summary judgment, grant Plaintiffs' motion, and enjoin the DOC from continuing its unconstitutional practice.

An appropriate order follows.


BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez, C.J.